**SOULIA v. O'BRIEN, Warden.**

**Civ. No. 50-73.**

United States District Court
D. Massachusetts.

Dec. 26, 1950.

Joseph J. McGovern, Boston, Mass., for plaintiff.

Henry P. Fielding, Asst. Atty. Gen., Stephen A. Moynahan, Dist. Atty. for Western Dist., Springfield, Mass., for defendant.

FORD, District Judge.

On June 29, 1950 this court, in a memorandum decision, 91 F.Supp. 965, dismissed without prejudice an application by the petitioner, imprisoned in the Massachusetts State Prison under a sentence of death, for a writ of habeas corpus on the ground that petitioner had not applied to the Supreme Court of the United States for a writ of certiorari and, therefore, had not exhausted his "available state remedies." Darr v. Burford, 339 U.S. 200, 212, 70 S.Ct. 587.

On July 11, 1950 the petitioner applied for a writ of certiorari to review the Massachusetts state court decision in the Supreme Court of the United States and on October 23, 1950 the petition was denied. On October 26, 1950 the petitioner filed in this court a second application for habeas corpus. An order to show cause was issued returnable November 7, 1950 and at the request of both parties the petition was set down for hearing on November 28, 1950. Because execution of sentence was imminent, proceedings against the petitioner were stayed, 28 U.S.C.A. § 2251, and at the request of counsel for petitioner a writ of habeas corpus ad testificandum was issued and the petitioner was present at the hearing. He did not testify.

Upon a denial of certiorari after a state court decision upon the merits of the federal questions, a federal court will not usually re-examine on habeas corpus the questions adjudicated. White v. Ragen, 324 U.S. 760, 764, 65 S.Ct. 978, 89 L.Ed. 1348; House v. Mayo, 324 U.S. 42, 65 S.Ct. 517, 89 L.Ed. 739; Ex parte Hawk, 321 U.S. 114, at page 118, 64 S.Ct. 448, 88 L.Ed. 572; Goodwin v. Smyth, 4 Cir., 181 F.2d 498; and cf. Schectman v. Foster, 2 Cir., 172 F.2d 339, 342. However, this court is in doubt, as pointed out in its opinion of June 29, 1950, that the Massachusetts state court re-

viewed and decided on their merits the federal questions presented to the court orally at the hearing on a motion for a new trial before the trial justice in the Massachusetts Superior Court and also in the hearing before the justice of the Massachusetts Supreme Court who heard the petition for allowance of an appeal to the Supreme Judicial Court of Massachusetts. Appeal was sought from the denial of the motion in the Superior Court for a new trial. Mass.G.L. Ch. 278, § 33E, as amended. No opinion was filed by either of the justices in denying these motions indicating that any federal questions were dealt with. Consequently, this court is of the opinion that it should review the facts relied on by petitioner in support of his contention that there was such a denial to him of the necessary elements of a fair trial in the Massachusetts trial court as to amount to a denial of due process of law under the provisions of the 14th Amendment.

The petitioner Soulia was indicted in the Massachusetts court for the murder of one Francis W. Hudson by shooting the latter in the back with a bullet from a rifle admittedly owned by Soulia. Soulia was convicted of murder in the first degree on April 4, 1949. The conviction was affirmed by the Massachusetts Supreme Court Com. v. Soulia, 325 Mass. 155, 89 N.E.2d 514.

The first ground relied upon by the petitioner in support of his application is that Sergeant Charles P. Van Amburgh, ballistics expert for the Commonwealth, committed perjury at the trial in the state court and the perjured testimony was knowingly used by the prosecuting district attorney to obtain his conviction. Undoubtedly this charge, if proven, would entitle the petitioner to release from his present custody. Pyle v. State of Kansas, 317 U.S. 213, 216, 63 S.Ct. 177, 87 L.Ed. 214; Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791.

### Van Amburgh.

Witness Van Amburgh is, and was at the time of trial, in charge of the Bureau of Ballistics of the Department of Public Safety, Massachusetts State Police, and had been in charge of that department since 1943. He succeeded his father, Captain Charles J. Van Amburgh, who was a nationally known ballistics expert and with whom the witness was associated as an assistant since 1931. The witness testified that on November 23, 1948 he received a bullet jacket and some bullet fragments from one Lieutenant Walker, a Doctor of Chemistry and Chief of the Chemistry Laboratory of the State Police. Lt. Walker testified he received the jacket and bullet fragments from Dr. Richard Ford, a medical examiner for Suffolk County and a member of the faculty of the Harvard Medical School, who testified he removed the bullet jacket and bullet fragments from the body of the deceased. Also present at the autopsy was Dr. Lorenzo A. Remy, medical examiner for the Chicopee district of Hampden County. He corroborated Dr. Ford and further testified that both he and Dr. Ford turned one large piece of a bullet jacket, four small fragments of a bullet jacket, and bullet fragments over to Lt. Walker at the time the autopsy was performed on November 23, 1948. The large piece of the bullet jacket, other fragments of the bullet jacket, and a lead bullet fragment were produced at the trial by witness Van Amburgh. (The jacket shell was marked as Ex. 64) Also produced by Van Amburgh was a discharged shell cartridge which the evidence showed had been taken by Lt. Cotter from the rifle which Soulia had in his possession at the scene and time of the crime and which was recovered in the woods near the scene of the crime. Witness Van Amburgh further testified at the trial and at the hearing here that he fired this rifle, a model 94 Winchester, calibre 30, center fire, and recovered bullets for test and comparison purposes; that he examined the test bullets and after comparing them microscopically with the large piece of bullet jacket recovered from the deceased's body, he stated that in his opinion the bullet jacket was part of a bullet fired from Soulia's rifle. He further testified he was able to make this comparison from the class (spiral grooves in barrel) and accidental (burrs and pits caused by

erosion and rust) characteristics present in the rifle barrel. The witness also testified that the discharged shell which Lt. Cotter recovered from Soulia's rifle and had been turned over to the witness by one Sergeant Ratigan, was fired from Soulia's rifle.

On cross examination Van Amburgh was asked to produce his test bullets and he produced three. He testified he shot, he believed, eight test bullets and when asked for the other five, he stated "they were of no value and I threw them away." The witness had placed a dot of ink on the nose of one of the three bullets produced and stated it was the best of the eight bullets fired for comparison purposes and the three were the "best of the eight". Because five shells and bullets were discarded, the witness was unable to match the bullets produced with three shells that were also retained and produced in court. The witness stated he selected, out of the eight bullets fired, the three shells and the three bullets he wanted to use. On re-direct examination the witness testified it was not uncommon to fire many test bullets for purpose of comparison. He also testified that the five test bullets that were discarded had the same characteristics as the three test bullets introduced in evidence and which were found on the fatal bullet jacket. Also he stated that the five discarded shells had the same characteristics imparted to them as the three shells produced in court. Witness also stated that the variation in the characteristics on fired bullets are due to the manner "the bullet conformed to the barrel as it went through, the way it took the one side as against the other side, the way the rifling was cut into the bullet * * * differences in the composition of the metal weight cause differences in markings, and that any one of the bullets might have been used for comparison with the fatal bullet, but the ones I selected were the best for the purpose."

It is with respect to this testimony given by Sergeant Van Amburgh under oath that the petitioner argues that the witness stated facts and opinions material to the issues involved in the trial of the petitioner which he knew to be false. Petitioner asks the court to make a finding of perjury committed and acquiesced in by the district attorney, because, as he says, Van Amburgh "recanted" his original testimony that the three test bullets compared microscopically with the alleged fatal bullet by stating, during cross examination, that he fired and recovered eight test bullets through the alleged fatal gun but threw five away because "they were of no value, and I threw them away." Also, the petitioner claims, he "recanted" his original testimony because he could not match the three bullets with the retained shells. Also, petitioner argues, that after an eighteen-minute recess the witness was recalled for re-direct examination and "recanted his recantation" by testifying that the five bullets and shells discarded had impressed on them the same characteristics as were on the three that were retained. Petitioner argues that during the recess, which the record shows was asked for by a juror and not by the district attorney, Sergeant Van Amburgh was "refreshed" by the district attorney; in other words, was induced by the district attorney to make the second so-called recantation. This court cannot follow the reasoning of counsel for the petitioner. It cannot even find that Van Amburgh retracted or disavowed anything he had previously testified to in his direct examination. True, because of the nature of a searching cross examination on the part of defense counsel, he was asked and did make a complete disclosure of the procedure employed and the basis for his conclusion as to the mortal bullet, a usual course of events, yet it is by no means apparent to this court that the witness deliberately falsified material facts. I have read the whole testimony of Van Amburgh and I cannot find in it any fact or opinion stated which he knew to be false. Reading the transcript of testimony, the trial took the usual course of a trial of the nature involved and this court finds as a fact that Sergeant Van Amburgh did not commit perjury in his testimony concerning the mortal bullet. Obviously, with this finding, the charge that the district attorney knowingly coerced and employed perjured testimony in this regard at the trial falls. In

the opinion of this court the charge against the district attorney is baseless and unwarranted. As far as this court can determine there is nothing in this charge nor in any other that reflects in the remotest manner upon the integrity of the district attorney and other state authorities.

The second ground relied upon by the petitioner is that Sergeant Van Amburgh, in complicity with the state authorities, deliberately suppressed and concealed the evidence that would have refuted the testimony of Van Amburgh concerning the mortal bullet. This charge falls into three categories; (a) the suppression of the five test bullets referred to, (b) the substitution of a phony bullet for the mortal bullet, and (c) the suppression of the ballistics expert Robinson who had been retained by the defense.

(a) With respect to the five bullets, little more need be said. There was no deliberate suppression of evidence. These bullets possessed, according to Van Amburgh, the same characteristics as those produced in evidence. There was no evidence presented that they did not. The petitioner argues that because Van Amburgh stated they were of no value then it follows they did not have the characteristics of the three retained. There was no evidence in the case to support such a conclusion. Van Amburgh explained, as is stated above, what he meant by the phrase "of no value." There is not the slightest foundation on which to base a contention that the five bullets constituted evidence favorable to the accused and Van Amburgh deliberately suppressed it.

(b) The charge that the state authorities suppressed evidence favorable to the accused in that they substituted a phony bullet for the mortal bullet in order that the mortal bullet produced at the trial would compare with the three test bullets admittedly fired through the rifle in the possession of the defendant and produced by Van Amburgh is, in the light of the evidence, particularly unreal. This charge was evidently based on the erroneous assumption by counsel for defendant that 32.40 bullets were found near the scene of the crime and

the alleged mortal bullet was of 30.30 calibre. The mortal bullet was taken from the body of the deceased by Dr. Ford, given to Lt. Walker of the Massachusetts Department of Public Safety and later turned over to Sergeant Van Amburgh for examination. Dr. Ford indentified the bullet jacket produced at the trial by Sergeant Van Amburgh as the one that was removed from the deceased at the autopsy. Lt. Walker indentified it as the bullet jacket that Dr. Ford gave to him for delivery to Sergeant Van Amburgh for examination. Nothing more need be said. There was no substitution unless it is concluded that these men of unblemished reputation were perjurers. The charge is groundless.

(c) The next charge is that Sergeant Van Amburgh suppressed the testimony of the ballistics expert retained for the defense by inducing the expert to make a false report to counsel for the defendant to the effect that the mortal bullet was fired through the accused rifle. The Massachusetts court under its procedure allowed counsel to retain an expert at the expense of the state. One Merton Robinson, a recognized expert on Winchester rifles, was retained by counsel on the recommendation of one Colonel Roy Jones of Springfield, Massachusetts, a recognized ballistics expert, who at the time was too ill to serve. On Robinson's visit to Van Amburgh's laboratory in Boston, the former was shown the three test bullets that were produced at the trial together with the mortal bullet jacket. All the facilities of the laboratory, such as facilities for firing guns, comparison microscope, and photographic equipment were made available. Because of Robinson's confidence in the standing of Sergeant Van Amburgh he fired no bullets himself but accepted the three test bullets and after an examination, included in which was the use of the comparison microscope, Robinson determined that the mortal bullet jacket and the test bullets were both fired through the accused rifle. He was obviously not called at the trial because of this conclusion. Sergeant Van Amburgh did not disclose to Robinson at this time that he had discarded five test bullets. At the hearing in this

court, the witness Robinson testified he was "persuaded" by Van Amburgh not to make any tests of his own and if he had known that five shells were discarded "as of no value" he would have testified at the time that the other three were of no value. Robinson here falls into the same error made by the petitioner. In his testimony he assumes that the discarded shells were of no value because they bore none of the characteristics of the accused rifle. The evidence of Sergeant Van Amburgh was to the contrary. Robinson got himself in a difficult position by failing to make his own tests which, in all probability, he should have made and when confronted with this dereliction he attempts to justify it by a statement that Van Amburgh induced him not to make any tests of his own. Robinson was an expert of long experience; he knew what his work called for; he was perfectly satisfied that the three test bullets shown him were fired by the accused rifle and he was satisfied to rely on these for comparison purposes with the mortal bullet jacket. In all this, I can find no evidence that Van Amburgh suppressed this witness. Van Amburgh offered Robinson the facilities of his laboratory. He could have made whatever tests he desired and it is too late to justify his failure to do so by accusing Van Amburgh of wrong conduct. The contention that Van Amburgh wrongfully induced Robinson to make a false report to counsel for the defense by relating to Robinson the background of the case is without any merit as the evidence at the trial and this hearing showed, and I find, that Van Amburgh did not discuss those details until after Robinson had completed his examination. Lastly, in this connection, it is difficult to see how Robinson could get away from the fact that the three test bullets he examined were fired by the accused's rifle and, if that were so, it would be difficult for him in any event, in the last analysis, to testify that the mortal bullet was not fired in the rifle unless he accepted the contention of counsel for the petitioner that the mortal bullet jacket and the test bullets produced were phonies. There is not the slightest evidence they were simulated. On the other hand, the evidence at the trial and here showed conclusively that the three test bullets were fired through the accused rifle by Van Amburgh and the mortal bullet jacket produced was the identical bullet retrieved from the body of the victim at the time of the autopsy. Van Amburgh did not suppress Robinson nor invite him to commit perjury; Robinson suppressed himself, if in truth there was any suppression. Further, if, at the trial, Robinson determined that the three test bullets produced were of no value for purposes of comparison, he did not testify to this fact and I find no evidence that defense attorneys suppressed any evidence favorable to the accused. This point, raised by counsel for applicant, is based on the wholly unwarranted assumption that the test bullets discarded were evidence of value to the defense, while as a matter of fact, I find they were, to be sure in a less degree than the test bullets produced, further evidence to support Van Amburgh's conclusion that the mortal bullet jacket was fired from the accused weapon.

 We now take up the charge that defense counsel, assigned by the court under the provisions of Mass.G.L. (Ter.Ed.) Ch. 277, § 47, rendered such ineffective assistance to the defendant that their conduct was tantamount to no assignment of counsel and a violation of petitioner's right under the due process clause of the 14th Amendment. Powell v. State of Alabama, 287 U.S. 45, 71, 53 S.Ct. 57, 77 L.Ed. 158. To maintain his position in this regard the petitioner would have to show that the representation of counsel appointed by the court was of such a low order as to amount to no representation at all. An extreme case must be shown. Moore v. Dempsey, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543; Brown v. State of Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682; United States ex rel. Feeley v. Ragen, 7 Cir., 166 F.2d 976, 980, 981. This charge cannot be maintained successfully by an argument that if present counsel were trying the case in the trial court, he would have tried it differently. There are no two counsel who try a case in the same manner. There is no exact

standard in this type of case nor in any type of case for counsel to follow. Methods differ, cf. Commonwealth v. Dascalakis, 246 Mass. 12, 27, 140 N.E. 470, and mistakes of counsel, in and of themselves, are not sufficient for habeas corpus. What is required of counsel is that every step of the way be contested in order that effective assistance can be said to be given the defendant by counsel assigned by the court and, if so, the requirements of due process are met. Avery v. State of Alabama, 308 U.S. 444, 450, 60 S.Ct. 321, 84 L.Ed. 377. The only practical standard for habeas corpus is the presence or absence of judicial character in the proceedings as a whole. Diggs v. Welch, 80 U.S.App.D.C. 5, 148 F.2d 667, 670.

■ There is no necessity, in this already too long memorandum, to set forth the steps taken by admittedly able counsel in this case to defend Soulia. They testified before this court. Chief counsel and his assistant were members of the Hampden County Bar for more than twenty years. They are men of wide experience in trying homicide cases and there was not the slightest evidence that they lay down on their job, as petitioner contends. This court has read the entire record and finds that Soulia's case was tried ably and well and counsel for the defense made the most of the meager tools they possessed. One example of counsel's lack of effectiveness that was charged at this hearing was that counsel failed to present to the state court a defense of insanity. The evidence showed Soulia was receiving compensation from the government for partial disability. He has shown evidence of psychoneurosis since his discharge from the armed forces in World War I. This fact was reflected in the records of the Veterans' Administration. Such evidence would have been ineffective to prove legal insanity. As opposed to the facts reflected in the Veterans' Administration reports was the evidence of the two disinterested experts appointed prior to trial by the state court under the provisions of Mass.G.L. Ch. 123, § 100A. Both of these experts reported on January 4, 1949 that the defendant showed no symptoms of mental disease that would affect his criminal responsibility. Two other psychiatric experts, on motion of defense counsel, were appointed by the court to examine Soulia. They examined him March 18, 1949, a month before trial, and both reported him legally sane. At the hearing in this court a psychiatric expert for the Veterans' Administration, who acquainted himself with the record, testified on the basis of what was disclosed on the record—he did not examine Soulia—that Soulia was legally sane. In the light of this testimony, it is idle to contend counsel for defense neglected to present an insanity defense. If they did present it one would wonder what they would say to convince a jury in this regard.

Counsel for defense filed and argued an appeal from Soulia's conviction in the Superior Court for Massachusetts and the conviction was affirmed.

I find that there is no merit whatever in the charge that Soulia's counsel rendered "ineffective assistance." On the contrary, I find that they performed their duties in an able and zealous manner in accordance with the high responsibilities reposed in counsel in defending a person accused of murder in the first degree.

■ Other points raised by the petitioner as to alleged errors of law committed at the trial are not dealt with as they could have been raised on the appeal and this proceeding is no substitute for an appeal in the state court. Errors, with respect to the admission of evidence and comments of the district attorney on the evidence, do not measure up to the dignity of lack of due process.

■ There is one last point. In his brief, counsel for petitioner refers to Soulia's failure to take the stand in his own defense. The charge in the brief is that the

trial justice "refused to permit the defendant to testify in his own behalf." There is not the merest basis for such a contention. In a statement made by Soulia and given to his counsel on April 11, 1949, during the trial of his case, in his own handwriting, Soulia elected not to take the stand. As counsel in the hearing before this court stated, it was a matter for Soulia himself to decide and he did so.

■ This court has dealt with all the allegations in support of the application for the writ and just a final word may be necessary as to why it has done so after the matters here were presented to justices of the Superior and Supreme Courts of Massachusetts. As is stated above, if there were findings indicating the state court had passed on the merits of Soulia's federal questions this court in all probability would have considered it a work of supererogation in the absence of unusual circumstances to pass upon them here. It is this court's opinion that unless it appears affirmatively that state courts have passed upon the federal questions involved, this court should review the questions raised. Cf. White v. Ragen, supra, 324 U.S. at page 767, 65 S.Ct. 978; House v. Mayo, supra; Ex parte Hawk, supra; Goodwin v. Smyth, supra; and Schectman v. Foster supra. In the latter case, the court seems to indicate a contrary view to that expressed here. Even if I am not right in my interpretation of the cases and principles involved in habeas corpus cases and the circumstances attending the hearing on the motion for a new trial, yet, in this case, it is best, in the light of the petitioner's contention that he has not up to date been given an opportunity to be heard on his federal questions, to settle the question whether Soulia had a fair trial in the Massachusetts court.

In the opinion of the court he did have a fair trial; his rights were zealously guarded under state law; and I find he was not deprived of any right in that court afforded him by the Constitution of the United States.

The stay of sentence is revoked as of January 10, 1951 and the petition is dismissed.