FRANKLIN L. HALL, APPELLANT, v. WARDEN, NEVADA STATE PRISON, RESPONDENT.

No. 5302

November 29, 1967 434 P.2d 425

*Lester H. Berkson,* of Zephyr Cove, for Appellant.

*Harvey Dickerson,* Attorney General, *Peter I. Breen,* Deputy Attorney General, Carson City, for Respondent.

## OPINION

By the Court, COLLINS, J.:

This is an appeal from a denial of habeas corpus. Appellant was convicted in the Eighth Judicial District Court of the crime of murder in the second degree upon his plea of guilty to that charge and was sentenced to the state penitentiary where he has served over one year. His application for a post-conviction writ of habeas corpus to the First Judicial District Court was denied, and he appeals to this court. He specifies error of the First Judicial District Court as follows:

1. That he was denied counsel before his arraignment in the Eighth Judicial District Court.

2. That his court-appointed counsel were ineffective and he was thus denied his right to counsel.

3. That his plea of guilty was not voluntary in nature.

4. That at the post-conviction hearing he was denied the right or opportunity to put in evidence pertaining to his innocence.

We conclude the denial of habeas corpus by the First Judicial District Court was correct and deny petitioner any relief from his conviction in the Eighth Judicial District Court.

On February 14, 1965, appellant was incarcerated in the Clark County jail on robbery charges. He had been in that jail approximately two and one-half months and although bail had been fixed and reduced to $500, he was unable to make bail. On that date appellant wrote and gave the following letter to a guard:

"Franz, sir:

"I wish to 'copout' to a murder. Come and take me upstairs quietly and quickly.

"Of all people—
"Franklin Hall (Francis)"

Appellant was taken to a separate room removed from the jail. He had in his possession a letter of confession which he then turned over to the authorities. The letter[1] confessed to a previously unsolved homicide. Appellant was next driven in a car to the scene of the homicide and was informed by the authorities that this was the location where the victim's body had been found. Following this, he was taken to the Las Vegas city jail where additional statements were taken from the appellant by the officers. Later that evening appellant wrote another full confession.

On February 17, 1965 appellant was visited by the Clark

[1] "Mr. District Attorney:

"On or about Dec 27th 1964 I approached a cab at the Riviera Hotel and instructed him to take me to the 500 block So 2nd St.

"Prior to entering the cab I had picked up a length of iron pipe about 11″ long with intentions of beating the Driver and robbing him.

"Upon entering the darkest section of the block on So 2nd I ordered him to pull over to the curb as we were in front of my house. He did and I immediately began to beat him about the head.

"He tried to stop me and jumped in the rear seat with me during the struggle.

"He begged me to stop because he said he had a bad heart. But he tried to trick me by pretending to reach for his money then attempting to leap out of the cab.

"He was bleeding badly from several places on the back of his head.

"I then hit him another couple of times and proceeded to reach into his pocket and get the money myself. I told him I intended to kill him because he had tried to trick me and then he didn't stop me any more so I took all the money he had on him except what might have been in his wallet for I didn't think of it at the moment.

"He kept begging me to please not hit him again but he was stupid because after I had the money and was going to dump him out he tried to grab me and we struggled for about 2 or 3 minutes.

"I told him that now I was going to kill him for sure and I beat him another couple of blows and then he sat there and closed his eyes and fell over like he was out. I then pushed him out the door.

"Before I could get into the front seat to drive away he got up and started to get away.

"I jumped out of the cab and pushed him hitting him once more. This time he fell on the side walk. I stood over him a moment and then walked to the cab and drove away.

"I parked the cab a few blocks away. I think it was on South 3rd St. Then I proceeded to a service station where I washed off his blood and counted the money. It was $32.00.

"I believe I hit him 8 or 10 times altogether. I hid the pipe in some grass in the alley between 2nd and 3rd St in about the 800 block So. I think it may still be there unless found by playing kids.

Franklin L. Hall
7 man tank
County Jail"

County district attorney in the jail. Appellant states he was advised by the district attorney: "They had the confessions, would use them if I was going to trial, they definitely would get a conviction, and he would call for life without possibility of parole."

Appellant was arrested and charged with murder on February 19, 1965. He was arraigned in justice court that same day. He advised the court he was without funds to obtain counsel. Nevada law at that time did not provide for appointment of counsel at the justice court level, and none was appointed. He was advised by the justice of the peace that he had a constitutional right to counsel but that the court had no authority to appoint counsel for him at that time. Appellant waived counsel and a preliminary hearing. He was bound over to the district court on the charge of murder. On his arraignment in the district court co-counsel were appointed for him because of his indigency. The court designated Wayne Clark, Esq., and Alfred Becker, Esq. Later Mr. Becker was allowed to withdraw and Douglas Shoemaker, Esq., was appointed as co-counsel.

At arraignment appellant entered a plea of not guilty to the murder charge. On April 30, 1965 appellant in the presence of his counsel in open court withdrew his plea of not guilty and entered a plea of guilty to second degree murder.

Defendant requested probation and the court ordered the matter continued pending receipt of a report and recommendation from the Department of Parole and Probation. Following receipt of that report appellant appeared in open court with his co-counsel and the deputy district attorney for the purpose of sentencing. A lengthy hearing was held at the insistence of the trial judge. The transcript of that hearing was not a part of the record before the First Judicial District Court on the hearing of the petition for habeas corpus, nor was it a part of the record before this court. We consider it to be of major importance, and have ordered it made a part of the record on appeal.

The transcript of the May 21st hearing conducted by the trial judge in the Eighth Judicial District Court is extensive and demonstrates a genuine concern by the trial judge, by the deputy district attorney and particularly by co-defense counsel in exploring the entire matter in depth. We attach a verbatim copy of that transcript to this opinion as an addendum.

The testimony before the First Judicial District Court shows that in handling the case both Clark and Shoemaker not only conferred with each other but also researched the law on the subject, conferred with other attorneys and investigated the facts surrounding the first written confession. They asked for a

psychiatric examination of the petitioner, which was granted by the court. In their opinion the biggest hurdle facing them was the first written confession of the petitioner. They felt that confession was admissible and greatly increased the chances of a conviction.

The record further shows that they conferred with the district attorney and were told that the state would, in exchange for plea of guilty to second degree murder, drop the open charge of murder and the robbery charge as well. The record then shows petitioner and his attorneys met to discuss this matter. His counsel related to him their opinions with regard to certain facts and situations they thought would possibly influence the court. They told him that it would be advantageous for him to accept the offer of the district attorney but they left the final decision in his hands. Five minutes before his arraignment he decided to change his plea to that of guilty to second degree murder. The court accepted his change of plea and sentenced him to not less than 10 nor more than 50 years in the state penitentiary. He could have been given a maximum sentence of life imprisonment.

We first turn to appellant's contention that he was denied his constitutional rights before arraignment. Since this case was initiated prior to June 13, 1966, the federal constitutional rights as pronounced in the case of Miranda v. Arizona, 384 U.S. 436 (1966), do not apply. Johnson v. New Jersey, 384 U.S. 719 (1966). We must therefore look to the pre-Miranda standards.

The federal constitutional standards with regard to a defendant's right to counsel at critical stages of the proceedings against him which were applicable at the time appellant appeared before the justice of the peace were those announced in Gideon v. Wainwright, 372 U.S. 335 (1963) (trial); Hamilton v. Alabama, 368 U.S. 52 (1961) (a proceeding at which a certain defense must be raised or be forever waived); White v. Maryland, 373 U.S. 59 (1963) (a proceeding where one must enter his plea); and Massiah v. United States, 377 U.S. 201 (1964) (where incriminating evidence was elicited by prosecuting officials). Under that authority we held in Victoria v. Young, 80 Nev. 279, 392 P.2d 509 (1964), that a preliminary hearing in Nevada was not a critical stage in the proceeding. Appellant's contention that the doctrine of Victoria v. Young has been superseded by Ibsen v. State, 83 Nev. 42,

422 P.2d 543 (1967), is not correct. Ibsen was predicated upon the statutory revision of NRS 171.370[2] which did not go into effect until April 3, 1965, a time after these preliminary proceedings were concluded.

The record shows that the justice of the peace advised petitioner of his constitutional right to counsel and his right to a preliminary hearing. He waived both of those rights at that time.[3] This was all the court was then required by law to do. Nor does petitioner's federal constitutional Sixth Amendment right to counsel as pronounced in Escobedo v. Illinois, 378 U.S. 478 (1964), apply. We said in Bean v. State, 81 Nev. 25, 398 P.2d 251 (1965), that a request for counsel was necessary before the Escobedo doctrine would be invoked. The record here is devoid of any demand by petitioner for appointment of counsel prior to arraignment in the district court.

An additional factor in this case is that the conviction came as a result of appellant's plea of guilty. We said in Rainsberger v. State, 81 Nev. 92, 399 P.2d 129 (1965): "A different complexion is cast upon claimed constitutional violations and other claims of error when, as here, a defendant charged with murder, has voluntarily and with the assistance of competent court-appointed counsel, entered a plea of guilty in open court. * * *

---

[2]"1. When the defendant is brought before the magistrate upon an arrest, either with or without a warrant, on a charge of having committed a public offense, the magistrate must immediately inform him of the charge against him, and of his right to the aid of counsel at every stage of the proceedings, and before any further proceedings are had.

"2. Any defendant charged with a felony or a gross misdemeanor who is an indigent may, by written application addressed to the district court and delivered to the magistrate, request the appointment of an attorney to represent him.

"3. The application shall be accompanied by the defendant's affidavit, which shall state:

"(a) That he is without means of employing an attorney; and

"(b) Facts with some particularity, definiteness and certainty concerning his financial disability.

"4. The magistrate shall forthwith transmit the application and affidavit to the appropriate judge of the district court. If, after reading the application and affidavit and conducting such further inquiry as he may deem necessary, the judge finds that the defendant is without means of employing an attorney, the judge shall appoint an attorney or designate the public defender to represent him."

[3]The practice with regard to indigent defendants was for them to waive their right before the magistrate, consent to be bound over and when arraigned before a district judge, counsel would be appointed who would then move to remand the case to the magistrate for a preliminary hearing.

The constitutional safeguards pointing to a fair trial are greatly diluted in significance, for a trial to determine the ultimate issue of innocence or guilt has been waived by the plea of guilty. The presumption of innocence has ceased to exist, and the defendant stands before the court an admitted murderer, asking mercy and understanding with respect to degree and penalty. If the plea of guilty is not itself constitutionally infirm, it would appear that one who has so confessed may not rely upon the constitution to free him. * * * Id. 95, 96.

\* \* \* \* \* \*

"We hold that where, as here, one accused of murder voluntarily pleads guilty upon arraignment in open court, with the advice of competent counsel, the federal constitutional right to counsel is not violated, notwithstanding the fact that the accused, before entering his guilty plea, was without counsel when he confessed the crime and at the preliminary hearing." Id. 100. Here there is no evidence that the plea was obtained in derogation of his constitutional rights.

Thus it can be said that so long as the plea itself was not coerced and petitioner was competently represented by counsel, the guilty plea, being the basis of the conviction, will not be open to collateral attack, and the errors, if there were any, would be superseded by the plea of guilty.

Accordingly, we must turn to examine the contention that appellant's court-appointed counsel were not competent and further that the action of counsel did not amount to effective representation.

It is true that the First Judicial District Court did not allow any great exploration of the competency of counsel based upon previous criminal experience and sustained an objection to that inquiry. However, as shown by the transcript of the sentencing attached hereto as an addendum, very little substance can be accorded to either charge that counsel were not competent or that their representation was not effective.

The case of People v. Ibarra, 386 P.2d 487 (Cal. 1963), squarely holds that inadequate representation by appointed counsel is the denial of a right of the defendant to counsel. Here appellant contends the ineffective representation stemmed from: (1) his counsel's failure to remand the case for preliminary hearing; (2) that counsel did nothing to try to suppress the confession before letting the petitioner change his plea to guilty; and (3) that counsel talked petitioner into changing his plea to that of guilty even though there were some questions as

to the voluntary nature of the confessions and the criminal means of the victim's death.

The cases seem to hold that to sustain a charge that counsel was incompetent, the assistance rendered must have been so ineffective as to be considered useless. Soulia v. O'Brien, 94 F.Supp. 764 (1950). The California case of People v. Logan, 290 P.2d 11 (Cal.App. 1955), summarizes the law on the subject. That court stated: "When it is claimed * * * that the defendant was inadequately represented by counsel * * * the question is whether he was substantially denied his constitutional right to be represented by counsel. * * * [citing among others, People v. Avilez, 194 P.2d 829 (Cal.App. 1948)]. But where an accused is represented by counsel and the basis of his claim is that he received poor advice, indicative of poor judgment on the part of his attorney, and acted thereon to his detriment, those facts, even if substantiated, do not amount to a denial of the right of representation. [citing cases]."

The court in People v. Wein, 326 P.2d 457 (Cal. 1958), similarity stated: "The handling of the defense by counsel * * * will not be declared inadequate except in those rare cases where his counsel displays such a lack of diligence and competence as to reduce the trial to a 'farce or a sham.'" (which involved retained counsel). But see In re Atchley, 310 P.2d 15 (Cal. 1957) (where appointed counsel has the same obligations as retained counsel).

The United States Circuit Court of Appeals in Ex rel. Weber v. Ragen, 176 F.2d 579 (7th Cir. 1949), in commenting upon the nature of the services given by counsel in meeting the due process requirement said, "the services of counsel meet the requirements of the due process clause when he is a member in good standing at the bar, gives his client his complete loyalty, serves him in good faith to the best of his ability, and his service is of such character as to preserve the essential integrity of the proceedings as a trial in a court of justice. He is not required to be infallible."

We conclude from the record before the court, as supplemented by the sentencing transcript, that appellant's representation by co-counsel was effective. Counsel were faced with a client who had made a completely voluntary admission and confession of a possible capital offense before he had been under suspicion. The first written confession which appears purely voluntary was admissible even under the Miranda doctrine. The latter admissions, although there may have been

some question about them, may also have been ruled admissible. The doctrine of Escobedo would not apply because petitioner had never requested an attorney. The proceeding in the justice's court at that time was not considered a critical stage in the proceeding under the Victoria rule. The one area where error possibly may have been committed was that of the district attorney's interrogating the appellant. Although police may not induce guilty pleas by threats, they may tell the accused what evidence they do have against him. Watts v. United States, 278 F.2d 247 (D.C. Cir. 1960). However, that possible error would preclude the admission only of the later statements of the appellant and not those made in the first written confession. White v. State, 82 Nev. 304, 417 P.2d 592 (1966).

Court-appointed co-counsel achieved a result for their client which seems more admirable than inadequate. Petitioner avoided the risk of a trial in which capital punishment or imprisonment for life without parole might have been affixed. Instead he was given a 10 to 50-year sentence for second degree murder. Furthermore, the pending robbery charges for which he was initially held in jail were dismissed.

 

The next assignment of error concerns the voluntariness of his change of plea from not guilty to guilty. A plea of guilty taken by coercion is not a proper basis for holding a person convicted under that plea. It makes the conviction based on the plea subject to collateral attack by way of habeas corpus. Herman v. Claudy, 350 U.S. 116 (1956). Such a conviction is no more consistent with due process than a conviction obtained by the use of a coerced confession. Waley v. Johnston, 316 U.S. 101 (1942). A coerced plea, however, is not the same as one induced by the police procedure of making known to the defendant their evidence. Telling him of such evidence is not itself coercion. Watts v. United States, supra. The record indicates that appellant's co-counsel advised him of the good and bad points of the case and what they thought would be elements and factors provable in court. After telling appellant their interpretation of the situation and evidence, they urged him to accept the state's offer to plead guilty to a reduced charge. However, they left that decision up to him. There is nothing in the record to indicate that the decision was made by Hall as a result of anything other than intelligent application of his own will to the problem. Explanations of evidence, possible results to be expected at trial and analysis

of the over-all situation by dedicated counsel cannot be correlated with compulsion. The record fails to support appellant's contention that his change of plea was not voluntarily made.

The next assignment concerns the refusal of the First Judicial District Court to allow appellant to offer evidence upon the question of guilt or innocence. Following a plea of guilty in open court while competently represented by counsel an applicant for habeas corpus in a collateral proceeding may not re-litigate the question of his guilt or innocence. Fisher v. Fraser, 233 P.2d 1066 (Kan. 1951); Rainsberger v. State, 81 Nev. 92, 399 P.2d 129 (1965).

Other assignments of errors were made by appellant but being of little significance we disregard them.

The denial of habeas corpus by the First Judicial District Court is sustained.

THOMPSON, C. J., ZENOFF, J., BATJER, J., and MOWBRAY, J., concur.

## ADDENDUM

REPORTER'S TRANSCRIPT OF CONSIDERATION OF PROBATION AND RENDITION OF SENTENCE HELD MAY 21, 1965 IN THE EIGHTH JUDICIAL DISTRICT COURT:

*By the Court:* This is the time set for the sentencing in this case, this defendant having entered a plea of guilty to the charge of second degree murder. Do you wish to make any remarks, Mr. Shoemaker?

*By Mr. Shoemaker:* Your Honor, I would like to indicate to the Court that although we fully realize the seriousness of this charge that there are some mitigating circumstances that I will request the court to take into consideration, number one, that this death was not caused by means which are shocking to the mind, that is by rape, poison or gun or something like that. In actuality the death was probably by accidental means, although we do not indicate or intend to indicate to the court that there was not the crime committed here but we would indicate that if the victim had good health or even normal health the death would not have occurred. We would further indicate to the court that some of the background of this particular individual, the defendant herein, should be taken into consideration and that is that as a youth he was somewhat broken up by the early death of his father. There has been,

as a result of that death some psychological problems which I am sure have contributed to his problems in which he now finds himself. I realize the nature of the crime is such that the court, of course, could not grant leniency as to any minimum sentence but I would indicate to the Court that the defendant has actually cooperated, he would never have been caught had his conscience not brought him before the Court. The District Attorney has so indicated and I would request that the Court take these factors into consideration when he sets the maximum term herein.

*By the Court:* What is the age of the defendant at this time?

*By Mr. Shoemaker:* I believe he is 23, Your Honor.

*By the Court:* Mr. Clark, do you wish to make a statement?

*By Mr. Clark:* Your Honor, I hope that I will not make a repetition of the very excellent remarks made by co-counsel; at the same time I would like to re-emphasize the fact that the defendant came from a religious family and he lost his father at a very early age. His mother had to go out to work and it was not proper supervision and as a consequence he was left mostly on his own. I would like to also comment on the facts that surround the circumstances of the incident and the deceased or of the victim and his disease and the fact that this came about through a struggle and there is a possibility that there is a question arises that the death ensued possibly not from any action upon the defendant other than a struggle, however, since the crime was committed at the same time and it appears evident that there was, the conclusion can be drawn that the victim meet his death through the means of the defendant. However, the defendant, of course, did not have any knowledge that the victim had a heart condition which was probably brought on by the struggle. The autopsy report has a neutral attitude on that as to whether he did actually die as a result of the struggle or by the efforts of the defendant.

Now, we do have a letter from the District Attorney indicating that he has not shown any history of any violent crimes before and we would like very much if Your Honor would respectfully consider the statement made by both counsel on behalf of the defendant and we would like to reiterate that the defendant has fully cooperated with the authorities, explained each and every detail and I think that he has even over-emphasized his participation in the incident and he more or less took the attitude that he wanted to be punished and he feels that he owes a debt to society but we would like, if Your

Honor please, that these facts and matters would be taken into consideration in fixing the maximum sentence.

*By the Court:* Thank you, Mr. Clark. Do you have anything that you would like to add to the comments of counsel, Mr. Bryan or Mr. Johns?

*By Mr. Bryan:* Well, Your Honor, the only thing I would like to do is point out that the criminal law is that the defendant takes the victim under the condition that he finds him. The report of the probation department rather adequately covers the offense report and the State, of course, stands upon the facts embodied in that particular report, Your Honor.

*By the Court:* Do you have anything further to add, Mr. Shoemaker or Mr. Clark?

*By Mr. Shoemaker:* No, Your Honor.

*By the Court:* Dr. O'Gorman has examined this defendant to determine his mental condition and Dr. O'Gorman has submitted a letter dated May 9, 1965 and in his report it is interesting to note in the second grammatical paragraph under the heading of Purpose of Examination is as follows: "This patient was seen in the County Jail. His initial comments were: 'I turned myself in for murder; I wanted to bring attention of my mother, my sister and my friend, Rick, to make them wish they had gotten me out'. This was in relationship to a purse-snatching charge, which he claims he did not do. 'It is no wonder I have killed.' "

Now, under Family History it states: "He was born in King City, Missouri, June 4, 1939, and lived there six months. The family moved to St. Joseph, Missouri, for one year, Pittsfield, Illinois for two years, Whitehall, Illinois one year, Highland, Illinois five years, Verdon, Illinois one year and then settled in Springfield, Illinois, where he remained until the year 1959 when he left for California with a friend of his. He has spent the remaining years of his life in Pasadena, California. His father died at the age of 73. The patient was 13 at the time and his father was a Baptist minister. 'I loved my father more than anything in the world. He took me fishing, go to the woods and walk, go to the park; I got more things from my father.' Mother is 63 years of age, alive and well, lives in Illinois. She was age 37 when the patient was born. There is one sister, age 23, single."

I have read the statement that the defendant gave after he returned to the City of Las Vegas and apparently he returned several times after this attack had occurred to determine what had happened to his victim. "I journeyed to the City Library and read the newspapers there and learned that the victim

had died." Remorse set in and he proceeded to go to the authorities and discuss this case with them.

Certainly it is to his credit that he has made a full and complete confession. The Court is not unmindful of that. You are to be commended for your change of heart, so to speak, on your part, and your confession in coming forward and making your statement and be willing to take your punishment, as you say.

I notice in the probation report there is a letter from the District Attorney, Mr. Marshall, to Mr. Gerow in which he says in part as follows:

"As you know Hall voluntarily confessed this crime and was not considered a suspect in the matter prior thereto. I have discussed the case with Hall personally on one occasion and have reviewed both the file and the facts of his confession. I have also received what I consider sound and reliable information concerning him from sources inside the jail. My impression is frankly that this boy is a most unlikely murderer, having come from a good home environment. I think there is a tinge of mental or social instability in his personality and I strongly recommend that he be given the benefit of all psychiatric services that may be available at the State Prison."

Now, I will certainly agree with that, I think that you certainly do need psychiatric help.

Now, as to the observation that this victim, the cab driver, who I understand was a family man, suffered a heart condition. Mr. Bryan, I believe, has correctly stated the law, not only in tort but also in criminal law. (Citing cases.)

*By Mr. Shoemaker:* But with the Court's permission we did not mean to indicate that the crime was not committed, all we indicated was that the circumstances should be taken into consideration by the Court in mitigation of the punishment.

*By the Court:* Well, I appreciate that, counsel. The one fact that impressed this Court when the Court was reading the statement of the defendant was that this was not a single blow. The beating took place in a relatively short period of time and this victim was struck several times on the head and then he asked the assailant to stop and he got in the back seat to try to stop him and the beating continued, apparently the assailant demanded money from the victim and the victim was trying to get out the door. The victim said he would give him his money and apparently tried to get out the door and the pounding and beating apparently kept up for some period of time. The victim then sort of rolled out the door and then staggered over

and fell on the pavement. It is my impression that this beating took place over some period of time.

*By Mr. Clark:* Well, in the statement it seems that the defendant has somewhat exaggerated the number of blows that were struck and later stated that he just wanted to punish himself to the fullest extent and he said that he had struck more blows than he actually had.

*By Mr. Shoemaker:* If the court has read the autopsy report—

*By the Court:* I have read everything that was submitted to me, the doctor's report, the statement, the District Attorney's letter and the report from the Department of Parole and Probation.

*By Mr. Shoemaker:* I don't believe the autopsy report was available to the Court. I have a copy with me if you would like to see it. May I approach the bench?

*By the Court:* Yes. Now, I have read the doctor's report. Do you have anything further?

*By Mr. Shoemaker:* Nothing further, Your Honor.

*By the Court:* You see, actually the defendant was engaged in the commission of a felony at the time this occurred and there have been other cases where the defendants have been convicted of first degree murder even though the Court has said that the fact that the victim of the assault was in a weakened condition, or was suffering from a disease, and death comes as a result of the blow which might not have been fatal under ordinary circumstances, nonetheless, they caused the death. I know of no duty imposed upon the victim to supply a guarantee of good health to a robber, and that is a true statement of the law, I believe. NRS 200.030 provides in part, in paragraph 4, as follows: "Every person convicted of murder in the second degree shall suffer imprisonment in the State Prison for a term of not less than 10 years, which makes 10 to life." In other words, he is subject to sentencing of the minimum 10 years which the Court may extend to life.

An information having been filed against you, Franklin Leslie Hall, charging you with the crime of second degree murder, and you having entered your plea of guilty thereto and no good reason having been shown why sentence should not be pronounced, at this time the Court finds you guilty as charged in the Information.

Now, therefore, it is the judgment and order of this Court that you be sentenced to and confined in the State Prison at or

near Carson City, Ormsby County, State of Nevada, for a period of not less than 10 years nor more than 50 years.

The defendant is remanded to the custody of the Sheriff.