BILLY GROSS v. STATE OF ARKANSAS

5-5408                                              440 S.W. 2d 543

Opinion Delivered May 12, 1969
[Rehearing denied June 9, 1969.]

. . . *Clark, Clark & Clark* for appellant.

*Joe Purcell*, Atty. Gen., *Don Langston*, Asst. Atty. Gen.; *Jerry D. Pinson*, Asst. Atty. Gen. for appellee.

LYLE BROWN, Justice. This is an appeal by Billy Gross from a conviction of second degree murder and a sentence of twenty-one years, which punishment was imposed as the result of a second trial which began on October 7, 1968. The principal attack upon the verdict is based upon the admission of evidence which showed that Gross remained silent in the face of a statement accusatory in nature made in his presence by an alleged accomplice. Other points for reversal are based upon the admission into evidence of certain photographs, testimony given at the first trial by a doctor who was absent from the State at the time of the second trial, and the reception in evidence of various items showing the presence of blood.

The State produced eyewitness evidence of an orgy of drinking, fighting, and sexual acts which occurred at the home of Frank A. Birch in the Hattieville commun-

ity, Conway County, on the night of Saturday, September 28, 1963, and which culminated in Birch's death. Birch was better known as Dutch Chartan. As did the witnesses, we will refer to him as Dutch.

According to the State's evidence, two couples assembled in North Little Rock early that Saturday night. They were Billy Gross, Dollie Jean Roberts, Benjamin Winegart, and Beverly Wilkerson. After procuring some whiskey and wine the two couples motored to Hattieville, some sixty miles distant. They first visited briefly at the home of Billy's mother. From there they drove to the home of Dutch Chartan, with whom Billy and Dollie Jean were well acquainted. The party first engaged in licentious dissipation with all five participating. The festivities culminated in a fight. Billy is said to have called Dutch vile names and accused Dutch of "snitching" on him. Dollie Jean testified that Billy announced his intention to kill Dutch; that Billy struck Dutch with a stick of wood, cut on Dutch's throat with a pocket knife, and then procured a saw and "started sawing his throat." She testified that the blows from the stick felled Dutch near a stove and that he remained there. The two couples were said to have left the premises shortly before dawn Sunday morning; they went back to the home of Billy's mother and slept until midafternoon. Upon arising they returned to Dutch's house, assertedly to procure more liquor. Gross and Winegart entered the house and stayed for some time. When they returned to the car the two couples drove back to North Little Rock. On the return trip Gross allegedly told the women to get together on a story that they had not been with Gross and Winegart and that Gross stated further the men would probably be out of the State by night.

Sheriff Marlin Hawkins, in response to a call, went with other officers to the home of Dutch Chartan that Sunday night about eleven o'clock. In the disheveled house they found Dutch's body. One or two sticks of

wood and a coke bottle and a saw were observed to be stained with a red substance which appeared to be blood. There was also a towel and a pan of water, both of which contained a reddish substance.

An all-points bulletin was circulated on Gross and Winegart and they were shortly apprehended in Lubbock, Texas. Sheriff Hawkins returned them to Morrilton, the county seat. Other facts pertinent to the appeal will be related as the points for reversal are discussed. We will not burden the opinion with much of the voluminous evidence introduced because the sufficiency of the evidence to sustain a conviction is not in question.

The first two points for reversal are concerned with what is commonly called the "tacit admission rule." Sheriff Hawkins testified that on the return trip from Lubbock, Benjamin Winegart started talking about the incident. The sheriff said he thereupon advised both Winegart and Gross that they were not being asked to discuss the charges, that any statements by them could be used at the trial, and that they were entitled to consult an attorney before making any statements. Winegart is said to have stated that they did not know they had killed Dutch until the officers arrested them in Lubbock.

Another conversation allegedly occurred at the jail in Morrilton some few days after Winegart and Gross were incarcerated. At that time they were together in a cell "no larger than a jury box." Sheriff Hawkins had learned that on their flight from North Little Rock to Lubbock, the men came through Morrilton, which was not on a direct route between the first named cities. Hawkins said he told Winegart and Gross at the jail that he was curious to know why they went out of their way to come by Morrilton. He testified that Winegart answered by saying that Gross intended to proceed to Hattieville, a short distance north of Morrilton, to the home of Dutch Chartan, and burn the building—"the

building in which Chartan's body was at." Winegart said he dissuaded Gross from that plan while they were eating a sandwich at Morrilton, and they proceeded to drive to Lubbock. Sheriff Hawkins testified that Gross could not help hearing the damaging statements made by Winegart and that Gross made no response.

The fact that Gross remained silent in the face of Winegart's statements was admissible in his first trial in 1964. *Moore* v. *State,* 229 Ark. 335, 315 S.W. 2d 907 (1958); *Martin* v. *State,* 177 Ark. 379, 6 S.W. 2d 293 (1928). The 1964 conviction, which carried a life sentence, was set aside by the federal court on a finding that Gross had been denied his constitutional rights with respect to having an appeal perfected. *Gross* v. *Bishop,* 273 F. Supp. 992 (1967). It was there held that the denial of due process could not be corrected except by new trial.

Prior to the second trial came the decisions in *Miranda* v. *Arizona,* 384 U.S. 436 (1966); and *Johnson* v. *State of New Jersey,* 384 U.S. 719 (1966). This rule affecting tacit admissions was stated in *Miranda*: "In accord with our decision today, it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. The prosecution may not, therefore, use at trial the fact that he stood mute or claimed his privilege in the face of accusation." Then followed the pronouncement in *Johnson* which said *Miranda* should apply only to cases commenced after *Miranda* was announced; and it was also stated that the *Miranda* guidelines "are therefore available only to persons whose trials had not begun as of June 13, 1966."

This brings us to the vital question in this case, namely, whether *Miranda* applies to the 1968 retrial. The question is treated exhaustively in *State* v. *Branch,* 161 S.E. 2d 492 (N.C. 1968). There it is emphasized that the whole tenor of *Miranda* is prospective in application,

not retroactive.  *Branch* cited with approval the case of *Jenkins* v. *State*, 230 A. 2d 262 (Del. 1967).   *Jenkins* summarizes the view of that court in these words:

> It is our opinion that *Miranda* should not apply at retrial, notwithstanding the fact that it will be held after the June 13, 1966 effective date of *Miranda*.   We think it neither logical nor reasonable that the retrial should be conducted under rules different from those prevailing when the cases were tried the first time.   In *Johnson* v. *State of New Jersey,* 384 U.S. 719, 86 S. Ct. 1772, 16 L. Ed. 2d 882 (1966), the United States Supreme Court stated: ''We hold further that *Miranda* applies only to cases in which the trial began after the date of our decision [June 13, 1966] * * *.''    Although *de novo,* a new trial is not a new case; it is a continuation of the original case until the judgment is final.   In our opinion, *Johnson* refers to ''cases'' the original trial of which commenced after June 13, 1966. Neither *Miranda* nor *Johnson,* in our view, requires the courts of this State to make applicable upon retrial the *Miranda* rules which were not applicable at the original trial.

In aligning with the view expressed in *Jenkins* we are not unmindful of the provisions of our Criminal Code which provide that a subsequent trial shall be de novo. Ark. Stat. Ann. § 43-2205 (Repl. 1964).   New York has the identical provision.   Its appellate court recently held that upon retrial after *Miranda,* the confessions used in the first trial before *Miranda,* and which were inadmissible under *Miranda,* were nevertheless admissible on retrial.   In disposing of the argument that the de novo provisions of the New York Code prohibited the use of the confessions on retrial, the court said that ''the crucial factors in determining whether *Johnson* v. *State of New Jersey* applies here are considerations of policy and not labels.   These sections are, therefore, totally irrelevant to the decision which we must make.'' *People* v. *Sayers,* 293 N.Y.S. 2d 769 (1968).

State appellate courts are not unanimous as to whether *Miranda* applies to retrial of a case originally tried on the merits before June 13, 1966. Numerically it can be approximated with reasonable certainty that a small majority of those courts passing on the question hold that *Miranda* does not so apply. Other than the three state jurisdictions heretofore cited, these cases from other state appellate courts are in agreement with the cited cases: *Chapman* v. *State,* 162 N.W. 2d 698 (Minn. 1968) ; *Sims* v. *State,* 156 S.E. 2d 65 (Ga. 1967) ; *People* v. *Worley,* 227 N.E. 2d 746 (Ill. 1967) ; *State* v. *Vigliano,* 232 A. 2d 129 (N.J. 1967) ; *Burnley* v. *Commonwealth,* 158 S.E. 2d 108 (Va. 1967) ; *Hall* v. *Warden,* 434 P. 2d 425 (Nev. 1967) ; *Boone* v. *State,* 237 A. 2d 787 (Md. 1968) ; and *Murphy* v. *State,* 426 S.W. 2d 509 (Tenn. 1968).

It is insisted that the court erred in admitting four photographs in evidence. The State offered ten pictures depicting the room in which Dutch Chartan met his death. The court admitted only four of the photographs. We are unable to say that the court abused its discretion. The four views of the room and the body could well have supported two theories of the State. The alleged instruments of attack were revealed by the pictures. Secondly, the State claimed that Gross and his companion returned to the scene, positioned Dutch's body and endeavored to clean his face of blood. The manner in which the body is depicted could be said to support the latter theory. The admission, relevancy, and materiality of the photographs are largely within the discretion of the trial judge. If they are accurately taken, show a correct representation of the subject matter, and can be said to be of aid to the jury, they are usually admissible. *Higdon* v. *State,* 213 Ark. 881, 213 S.W. 2d 621 (1948). The point is without merit.

Another point concerns the reading by the State of the testimony given by Dr. Roy Hoke in the 1964 trial. He was the pathologist who performed the autopsy on the deceased. In offering that testimony the State met

the requirements of Ark. Stat. Ann. § 28-713 (Repl. 1962). Appellant's only contention is that his court-appointed attorney did not have time to prepare for the examination of this medical witness at the first trial. We find no evidence in the record to sustain that contention.

The trial court permitted Sheriff Hawkins to testify that certain sticks of wood, a coke bottle, a pan of water, and a towel, contained a reddish substance similar to blood. The court also permitted the introduction of all of these items except the pan of water, which was not available. The final point on appeal questions the propriety of the . fore-going evidence. We think the intention is clearly without merit. The State produced other evidence that a terrific fight had taken place. There was direct testimony that sticks of wood were used in the affray. There was no direct testimony that the bottle was utilized, nor was there direct evidence that it was not used. An analysis of the items enumerated revealed the reddish coloration to be human blood. There was direct testimony that deceased was struck with sticks of wood. There was also evidence that blood had been cleaned off the victim's face between the time of the beating and the moment the officers found him. It is true that the blood to which Sheriff Hawkins testified, or at least some of it, could have come from other participants in the affray. On the other hand, the fact that the deceased's body showed evidence of being beaten and cut, and possibly by the instruments introduced, would justify the jury in believing that some of the blood probably came from the body of the deceased. Considering the fact that the instruments introduced, together with their condition, would tend to support the State's theory that Dutch was severely beaten, we cannot say the trial court abused its discretion. See *Glover* v. *State*, 194 Ark. 66, 105 S.W. 2d 82 (1937).

Affirmed.

BYRD, J., not participating.